IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION, AT MEMPHIS

---

LARRY DOUGLAS,  )
              )
    Plaintiff,  )
              )
    v.  )   Case No.: 2:18-cv-02420-SHM-dkv
              )
DR. MARK T. ESPER,  )
Secretary of Department of  )
the Army,  )
              )
    Defendant.  )

---

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

---

On June 19, 2018, Larry Douglas ("Douglas"), proceeding *pro
se*, filed an employment discrimination complaint against Dr. Mark
T. Esper, the secretary of the Department of the Army ("Esper"),
on the court-supplied form alleging race and color discrimination
pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§ 2000e et seq., ("Title VII"), age discrimination in violation of
the Age Discrimination in Employment Act of 1967 (the "ADEA"),[1]
disability discrimination in violation of the Americans with

---

[1] Douglas did not check the box on the first page of the
court-supplied form selecting the ADEA but he did check the box
next to "Age" on page four of the form complaint indicating that
he believed the Agency was discriminating against him on the basis
of his age. (Compl., ECF No. 1.) Furthermore, Esper addressed
the ADEA claim in his motion for summary judgment. (Def's Mot.,
ECF No. 30.)

Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008 (the "ADA"),[2] and retaliation. (Compl., ECF No. 1.) Before the court is Esper's motion for summary judgment, filed on July 19, 2019. (Def.'s Mot., ECF No. 30.) On September 10, 2019, Douglas filed his *pro se* response to Esper's motion for summary judgment. (Resp., ECF No. 36.) Esper did not file a reply. This case has been referred to the United States Magistrate Judge for management and for all pretrial matters for determination and/or report and recommendation as appropriate. (Admin. Order 2013-05, Apr. 29, 2013.)

For the following reasons, it is recommended that Esper's motion for summary judgment be granted as to Douglas's claims for race discrimination, color discrimination, age discrimination, retaliation, and disability discrimination on the basis of his hearing-related disability, and be denied as to Douglas's claims for disability discrimination and failure to accommodate his disability on the basis of his posttraumatic stress disorder ("PTSD"). In addition, it is recommended that all Douglas's claims of discrimination for failure to promote be denied for failure to exhaust administrative remedies.

---

[2] As discussed in more detail *infra*, Part II.F, Douglas's ADA claim will be analyzed as a claim brought pursuant to the Rehabilitation Act.

## I.    PROPOSED FINDINGS OF FACT

The court finds that the following facts are undisputed for the purpose of summary judgment:[3]

This case arises out of Douglas's claim that the Department of the Army, Army Corp of Engineers (the "Agency") discriminated against him because of his race, color, age, and refused him a reasonable accommodation for his disability, as well as retaliated

---

[3] Douglas's response to Esper's summary judgment fails to comply with Local Rule 56.1(a) which states:

> Any party opposing the motion for summary judgment must respond to each fact set forth by the movant by either:
> (1)  agreeing that the fact is undisputed;
> (2)  agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or
> (3)  demonstrating that the fact is disputed.
>
> Each disputed fact must be supported by specific citation to the record.  Such response shall be filed with any memorandum in response to the motion.  The response must be made on the document provided by the movant or on another document in which the non-movant has reproduced the facts and citations verbatim as set forth by the movant.  In either case, the non-movant must make a response to each fact set forth by the movant immediately below each fact set forth by the movant . . . . Each such disputed fact shall be set forth in a separate, number paragraph with specific citations to the record supporting the contention that the fact is in dispute.

Local Rule 56.1(b).  Douglas failed to attach a response to each of Esper's undisputed facts per Local Rule 56.1(b). While this makes it more difficult to ascertain Douglas's arguments, the court has examined Douglas's attached exhibits and included them in the analysis where relevant and has examined the record as a whole to establish whether there are genuine disputes of material fact.

against him.  (Compl., ECF No. 1.)  Douglas is an African American
male, over the age of forty.  (Def.'s Ex. 1 at 14, ECF No. 30-3.)
Douglas was employed by the Agency from 1981 to November 2012,
approximately thirty-one years.  (*Id.*)  He was originally hired to
work as a pipelineman and as such, he worked aboard a dredge boat
seasonally each year during the dredging season.  (*Id.*)  In 1997,
Douglas was assigned to the Dredge Hurley.  (*Id.*)

In addition to working as a pipelineman, Douglas also served
as a union representative and worked with the Agency's EEO office
for roughly twenty years.  (Def.'s Statement of Undisputed Facts
¶ 6, ECF No. 30-2.)  Douglas was a member of a class who in 1997
settled a class action against the Agency for racial
discrimination.  (Def.'s Ex. 27, ECF No. 30-28.)  Pursuant to the
settlement agreement, the Agency assigned Douglas and the other
members of the class to full-time positions.  (Def.'s Ex. 1, ECF
No. 30-3.)  This included providing Douglas work during the non-
dredging season.  (*Id.*)  Douglas was assigned to a set of duties
in the electrical shop of the Agency's Ensley Engineer Yard (the
"EEY") as a maintenance worker.  (Def.'s Ex. 1, ECF No. 30-3.)
There were also instances of the Agency placing Douglas outside of
the EEY electric shop as directed by the Agency's needs.  (*Id.*)

In October 2009, Douglas was involved in a work-related
accident when a boat capsized in the Mississippi River while
Douglas was onboard.  (*Id.*)  After recovering from his injuries,

4

the Agency temporarily assigned Douglas as a maintenance worker in
the EEY electric shop.  (Def.'s Ex. 30, ECF No. 30-29.)  Despite
this, the Agency continued to categorize Douglas as a pipelineman.
(Def.'s Ex. 26, ECF No. 30-27.)  For three months in 2010, from
May to June, Douglas worked on the Dredge Hurley as a pipelineman;
however, this was only while the dredge was dry docked.  (Def.'s
Ex. 30, Req. No. 4, ECF No. 30-31.)

On June 1, 2010, Douglas sent Richard Sullivan – the then-
chief of the physical support branch and part of Douglas's chain
of command – an e-mail explaining that he was now fearful for his
life if forced to continue working on the water.  (Def.'s Ex. 5,
ECF No. 30-7.)  According to Esper, the Agency treated the e-mail
as a request for reasonable accommodation.  (Def.'s Ex. 6, ECF No.
30-8.)  Several months later in September 2010, the Agency
requested medical evidence from a treating physician documenting
that Douglas suffered from a disability.  (*Id.*)  The Agency
specifically requested that a physician consider Douglas's
position description, working conditions, problems, and provide a
long-term prognosis and recommendation on restrictions and
accommodations.  (*Id.*)  On January 7, 2011, the Agency made a
second request for medical evidence.  (Def.'s Ex. 7, ECF No. 30-
9.)

On March 17, 2011, the Agency denied Douglas an accommodation,
citing his lack of medical documentation as the reason.  (Def.'s

Ex. 8, ECF No. 30-10.)  The notice of denial included an additional request for medical evidence and informed Douglas that, once the Agency received documentation, it would work with Douglas to provide him with an accommodation.  (*Id.*)

On June 23, 2011, the Agency directed Douglas to report to duty on the Dredge Hurley for the beginning of the 2011 dredging season.  (Def.'s Ex. 9, ECF No. 30-11.)  The next day, Douglas submitted medical documentation from Dr. Shearest Crenshaw ("Dr. Crenshaw") to his supervisor which contained a work restriction. (Def.'s Ex. 2, ECF No. 30-4.)  The document from Dr. Crenshaw stated that Douglas could not work near or in water beginning June 24, 2011 through December 24, 2011.  (Def.'s Ex. 10, ECF No. 30-12.)  Based on this documentation, the Agency notified Douglas that he would be assigned a set of duties in the electric shop, performing the same duties that he had been performing when he was working in the electric shop during non-dredging seasons.  (Def.'s Ex. 11, ECF No. 30-13.)  Subsequently, on July 14, 2011, the Agency determined that Douglas's documentation was insufficient to establish that he was disabled and entitled to a reasonable accommodation because the documentation merely stated that, due to an illness, he could not work at or near the water and it did not explain how his disability impacted his ability to perform his job as pipelineman.  (Def.'s Ex. 32, ECF No. 30-33.)

6

Once Douglas's medical restriction expired, the Agency again denied Douglas's reasonable accommodation request because it found that the documentation provided was insufficient. (Def.'s Ex. 13, ECF No. 30-15.) Douglas was again ordered to report to the Dredge Hurley effective March 4, 2012 for the beginning of the 2012 dredging season. (*Id.*) On February 28, 2012, Douglas provided his supervisor, Donald Mayer ("Mayer"), with a letter from Lenn Harris Milam ("Milam"), a licensed clinical pastoral, marriage, and family therapist, dated December 11, 2011. (Def.'s Exs. 3, 12, ECF Nos. 30-3, 30-14.) Dr. Crenshaw, Douglas's primary care physician, referred Douglas to Milam. (*Id.*) Milam saw Douglas for a total of eight psychotherapy sessions regarding the October 2009 accident. (*Id.*) In her summary, Milam noted that Douglas expressed that he could work while the dredge was docked, as long as he worked in certain areas that would that not require him to work close to the water. (*Id.*) Milam also noted Douglas's symptoms including "loss of sleep, the need to take showers instead of immersing himself in water. . ., high levels of anxiety, thrashing around at night in bed, and fear for his life." (*Id.*) As treatment, Milam noted that she had taught Douglas breathing and thought techniques as well as guided imagery. (*Id.*) Furthermore, Milam noted that Douglas did suffer from PTSD, and that while he was getting better, she felt the need to refer him

7

to a specific licensed professional counselor who is trained in a technique often used in posttraumatic stress situations. (*Id.*)

On March 2, 2012, the Agency informed Douglas that the documentation that Milam provided was inadequate to show that he was disabled and entitled to a reasonable accommodation. (Def.'s Ex. 3, ECF No. 30-5.) Specifically, the Agency stated that the documentation was inadequate because Milam did not provide a diagnosis or prognosis of his condition or an assessment of how he was restricted in the essential functions of his position, and that she simply restated what Douglas told her rather than giving a medical opinion. (*Id.*)

Douglas provided a supplemental record from Milam dated March 2, 2012, which more specifically stated that he suffered from PTSD. (Def.'s Ex. 15, ECF No. 30-17.) The documentation further explained that Douglas's symptoms were triggered by Douglas being on a vessel where he can see the Mississippi River. (*Id.*) Milam opined that based on the criteria of PTSD and the position description of pipelineman, Douglas could not perform the duties of pipelineman and that no accommodations could be made for him to continue to be a pipelineman. (*Id.*) Milam noted, however, that Douglas had been working in the EEY electric shop since the settlement in 1997 and had been given duties at other various times during the year. (*Id.*) Accordingly, as an accommodation, Milam recommended assigning Douglas to the electric shop because Douglas

could work there without experiencing his symptoms. (*Id.*) Milam also noted that while Douglas had voluntarily boarded and moved about the Dredge Hurley on other occasions, this was while it was docked, and he worked where he could not see the Mississippi River. (*Id.*)

After receiving this supplemental documentation, Mayer instructed Douglas to report for duty on the Dredge Hurley while it was docked for two weeks; however, when Douglas attempted to report, he found that he was unable to walk to the vessel. (Def.'s Ex. 3, ECF No. 30-5.) As a result, Douglas was approved for sick leave for the rest of the day. (*Id.*) The Agency then allowed Douglas a "temporary accommodation" of using his sick leave for treatment and recovery. (*Id.*) The Agency then requested that Douglas provide a resumé so that the Agency could determine Douglas's qualifications for other positions within the Agency. (Def.'s Ex. 16, ECF No. 30-18.)

After reviewing his resumé, on March 21, 2012, the Agency determined that for all open positions Douglas was either not qualified or, if he did qualify, it would violate his work restriction requiring him to not be near the water. (Def.'s Ex. 17, ECF No. 30-19.) Accordingly, the Agency determined that there was no available position in which to accommodate him and extended his sick leave. (Def.'s Ex. 1, ECF No. 30-3.) Following this determination, Amy Balentine, Ph.D., ("Dr. Balentine") sent a

9

letter to the Agency regarding Douglas's disability. (Def.'s Ex.
20, ECF No. 30-22.) Dr. Balentine affirmed Douglas's diagnosis of
PTSD and explained it was a result of the October 9, 2009 accident.
(*Id.*) Dr. Balentine also indicated that Douglas would need ongoing
therapy and potentially needed medication to address his symptoms.
(*Id.*) Like Milam, Dr. Balentine also indicated that Douglas would
be successful in working in the EEY electric shop as he had done
in the past because this setting did not trigger his symptoms.
(*Id.*)

In April 2012, the Agency announced via email that it would
be conducting a spring training week and safety day for Memphis
District Federal Building personnel later in the month. (Def.'s
Ex. 24, ECF No. 30-25.) Douglas requested to attend, but Mayer
denied Douglas's request because the training was limited to
federal building personnel. (Def.'s Ex. 25, ECF No. 30-26.) Mayer
did allow Douglas to attend the appropriate training for the
physical support branch in which he was assigned. (Def.'s Ex. 14,
ECF No. 30-16.)

On July 9, 2012, the Agency reviewed open positions again
and, for the second time, determined that Douglas either was not
qualified or the position would violate his medical restrictions.
(Def.'s Ex. 21, ECF No. 30-23.) In October 2012, Douglas submitted
a follow up letter from Dr. Balentine again explaining his symptoms
and his triggers. (Def.'s Ex. 23, ECF No. 30-24.) On October 23,

2012, however, Douglas received a notice of proposed removal for inability to perform his duties.  (Def.'s Ex. 3, ECF No. 30-5.) The Agency cited the reason as Douglas's failure to perform the duties of pipelineman because of his condition and because there were no other positions available at the EEY for which he was qualified.  (Def.'s Ex. 19, ECF No. 30-21.)  The Agency claimed that anything else would be an undue hardship. (*Id.*)  In addition, the Agency determined that there was no permanent position in the electrical shop where Douglas had been working since being converted to a full-time employee after the 1997 settlement. (Def.'s Ex. 29, ECF No. 30-30.)  Finally, on November 15, 2012, the Agency issued a notice of decision to remove Douglas for inability to perform his duties.  (*Id.*)

On June 6, 2018, Douglas filed his *pro se* complaint against Esper alleging claims pursuant to Title VII, the ADEA, and the ADA.[4]  (Compl., ECF No. 1.)  In the space provided on the form complaint for alleging discriminatory conduct, Douglas checked the boxes for termination, failure to promote, failure to accommodate disability, and retaliation. (*Id.* ¶10.) As a basis for his claims of discrimination, Douglas alleged race (African American), his color (Black), his disability (PTSD), and his age (more than 40 years old at the time of discrimination).  (*Id.* ¶9.)  As a factual

---

[4] *See supra* notes 1 and 2.

basis for his claims of discrimination, Douglas stated that he was forced to return to work on the Dredge Hurley against medical restrictions between February and March 2012; on March 13, 2012, he was forced to work on his resumé at the administration building instead of the EEY shop; on April 19, 2012, he was denied a training opportunity at the Memphis Federal Office Building; and on November 15, 2012, he was terminated because he would not return to work on the Dredge Hurley due to PTSD after an accident. (*Id.* ¶10.)

## I.    PROPOSED CONCLUSIONS OF LAW

### A.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgement is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also LaPointe v. United Autoworkers Local*, 600, 8 F.3d 376, 378 (6th Cir. 1993); *Osborn v. Ashland Cty. Bd. of Alcohol, Drug Addiction & Mental Health Servs.*, 979 F.2d 1131, 1133 (6th Cir. 1992)(per curium).    The moving party has the burden of showing that there are no genuine disputes of material fact at issue in the case. *LaPointe*, 8 F.3d at 378.    This may be accomplished by pointing out to the court that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 3177, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1898).

12

In response, the non-moving party must go beyond the pleadings and present significant probative evidence to demonstrate that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993); *see also LaPointe*, 8 F.3d at 378. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *LaPointe*, 8 F.3d at 378.

In deciding a motion for summary judgment, the "[c]ourt must determine whether 'the evidence presents a significant disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993)(quoting *Anderson*, 477 U.S. at 251-52). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Matsuchita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Patton*, 8. F.3d at 346; *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). However, to defeat a motion for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could

13

reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252;
*LaPointe*, 8 F.3d at 378.  Finally, a court considering a motion
for summary judgment may not weigh evidence of make credibility
determinations.  *Anderson*, 477 U.S. at 255; *Adams v. Metiva*, 31
F.3d 375, 379 (6th Cir. 1994.)

B.    Douglas's Failure to Promote and Hearing-Related Disability
      Discrimination Claims

     In his motion for summary judgment, Esper argues that
Douglas's claims of failure to promote and disability
discrimination on the basis of a hearing-related disability should
be dismissed for failure to exhaust administrative remedies.
(Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 30-1.)
Administrative exhaustion involves (1) timely filing a charge of
employment discrimination with the EEOC and (2) receiving and
acting upon a statutory right-to-sue notice.  *Granderson v. Univ.
of Mich.*, 211 F. App'x 398, 400 (6th Cir. 2006).  The purpose of
this requirement is to "trigger an investigation, which gives
notice to the alleged wrongdoer of its potential liability and
enables the EEOC to initiate conciliation procedures in an attempt
to avoid litigation." *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th
Cir. 2004)(citation omitted).  A judicial complaint must be
confined to the scope of the investigation that would reasonably
be anticipated to grow from the charge of discrimination the
plaintiff filed with the EEOC. *Id.*  Title VII's EEOC charge-

14

filing requirement is a mandatory claim-processing rule that must be enforced if timely raised. *Fort Bend Cty. v. Davis*, 139 S. Ct. 1843 (2019); *see also* 42 U.S.C. §12117(a)(applying enforcement provisions of Title VII to the ADA) & 29 U.S.C. § 626(d)(1)(A)(stating that a charge for violation of the ADEA must be filed within 180 days of the alleged unlawful act).

Douglas never alleged any claim for failure to promote or any claim for disability discrimination on the basis of his hearing disability in his formal EEOC complaint of discrimination. (Def.'s Ex. 31, ECF No. 30-32.) Douglas filed his first formal complaint of discrimination with the EEOC on April 19, 2012, and on November 13, 2012, Douglas filed a second formal complaint which was consolidated into his first. (*Id.*) In his EEOC complaint of discrimination, Douglas alleged discrimination because of his race, color, age, disability, and reprisal. (*Id.*) The only disability listed was PTSD. (*Id.*) At no point in either his first or amended charge did Douglas allege that he was not promoted or that the Agency discriminated against him on the basis of a hearing-related disability. (*Id.*) Nor did Douglas allege facts, before his deposition for this case, which would reasonably raise the issues of failure to promote or discrimination on the basis of his hearing-related disability. While Douglas provided documentation regarding his hearing-related disability, it was only after he filed an EEOC complaint and as an attachment to his

response to Esper's motion for summary judgement. (Pl.'s Ex. B,
ECF No. 36-4.)

Because Douglas failed to exhaust his remedies regarding
these two claims, it is recommended that Esper's motion for summary
judgment regarding Douglas's claim for failure to promote and his
claim of disability discrimination on the basis of his hearing-
related disability be granted.

C.   Douglas's Discrimination Claims on the Bases of Race and Color

In his complaint, Douglas alleges both racial discrimination
and color discrimination.   Title VII makes "it an unlawful
employment practice for an employer . . . to discriminate against
any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such
individual's race, color,. . . ." 42 U.S.C. § 2000e-2(a)(1).

1.   *Douglas's Color Discrimination Claim*

Color discrimination is distinct from race discrimination.
*Moore v. Food Lion*, No. 3:06-0712, 2007 WL 596955, at *2 (M.D.
Tenn. Feb. 21, 2007)(quoting *Bryant v. Bell Atl. Md., Inc.*, 288
F.3d 124 133 n.5 (4th Cir. 2002)).   Color discrimination "'arises
when the particular hue of the plaintiff's skin is the cause of
the discrimination, such as in the case where a dark-colored
African-American individual is discriminated against in favor a
light-colored African-American individual.'" *Moore*, No. 3:06-0712,
2007 WL 596955, at *2 (quoting *Bryant v. Bell Atl. Md., Inc.*, 288

16

F.3d 124 133 n.5 (4th Cir. 2002). Douglas's allegations focus almost exclusively on other bases of discrimination, such as race and disability discrimination, and are entirely "devoid of any hint that [his] particular skin tone motivated the alleged discrimination." *See Bryant*, 288 F.3d at 133 n.5. Accordingly, it is recommended that Esper's motion for summary judgment be granted as to Douglas's claim for color discrimination.

2. *Douglas's Race Discrimination Claim*

Esper contends that he is entitled to summary judgment on Douglas's race discrimination claim because Douglas cannot establish a *prima facie* case of race discrimination under Title VII. When there is no direct evidence of discrimination shown, the claim is governed by the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), later modified by *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). To establish a *prima facie* case of race discrimination, a plaintiff is required to show that: (1) he is a member of a protected group; (2) he was subjected to an adverse employment decision; (3) he was qualified for the position; and (4) he was either replaced by a person outside of the protected class or was treated differently than similarly situated non-protected employees. *See Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010); *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004).

If the plaintiff makes this showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its decision. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006). If the defendant successfully rebuts the plaintiff's assertions of discrimination, the plaintiff must then demonstrate by a preponderance of the evidence that the legitimate reasons set forth by the defendant were pretextual, *i.e.*, fabricated for the purpose of concealing an unlawful motive. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391–92 (6th Cir. 2008). The ultimate burden of persuasion, however, never shifts from the plaintiff. *Id.* at 392.

As to the first and third elements of a *prima facie* case of race discrimination, Douglas can establish that he is a member of a protected group and Esper does not seem to suggest that Douglas was not qualified for purposes of his Title VII claim. (Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 30-1.) As to the remaining two elements, Esper argues that Douglas cannot show that he was subject to adverse employment action or establish that similarly situated individuals outside of his protected class were treated better. (*Id.*)

Douglas alleges that the Agency took the following adverse employment actions: (1) returned him to work at the Dredge Hurley against his medical restrictions; (2) wrongfully required him to move from the EEY computer to the Administration Building computer

while working on his resumé; (3) wrongfully denied him training at
the Federal Office Building; and (4) terminated his employment.
(Compl., ECF No. 1.) The Sixth Circuit has defined adverse
employment actions as decisions that "constitute[] a significant
change in employment status, such as hiring, firing, failing to
promote, reassignment with significantly different
responsibilities, or a decision causing a significant change in
benefits. *Freeman v. Potter*, 200 F. App'x 439, 442 (6th Cir.
2006)(quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742,
761 (1998)). Generally, adverse actions typically are actions
which inflict some type of "economic harm" and must amount to a
"materially adverse change" in the conditions or terms of
employment, rather than something which is merely disruptive or
inconvenient. *Id.* (citing *Kocsis v. Multi-Care Mgmt.*, 97 F.3d
876, 885-86 (6th Cir. 1996)). While requiring Douglas to move to
a different building to complete his resumé may have been
inconvenient for Douglas, this is not an adverse employment action
within the meaning of Title VII. Nor was Mayer's decision to deny
Douglas's request to attend training in a separate facility when
he was going to receive similar training for employees within his
facility at a later date. Neither of these actions are so adverse
as to materially change or alter Douglas's employment.
Accordingly, for these specific acts, Douglas fails to establish
that he was subject to an adverse employment action.

Termination of employment is an adverse employment action. However, as to termination of employment, Douglas fails to meet the fourth prong of his *prima facie* case for race discrimination which requires that he show he was either replaced by a person outside of the protected class or was treated differently than similarly situated non-protected employees. The plaintiff bears the burden to show that claimed comparable employees are similarly situated in all relevant aspects. *Eregovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). This showing requires that the plaintiff compare the treatment of the plaintiff with the treatment of fellow employees in employment situations "nearly identical" to the plaintiff's in all relevant respects. *Id.* at 352. To be properly comparable, the individuals "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct of the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Failure to provide evidence regarding the alleged comparator's "position, job responsibilities, years of experience, length of tenure [], or disciplinary history" is fatal to a plaintiff's *prima face* case of discrimination. *Fuelling v. New Vision Med. Labs. LLC*, 284 F. App'x 247, 255 (6th Cir. 2008).

20

Douglas has failed to present any evidence from which a jury could find he was treated differently than similarly situated non-protected employees.  His blanket assertions that a supervisor or manager behaved differently with respect to African Americans is not enough to demonstrate that he was treated differently than similarly situated individuals because of his race.  Douglas lists no comparators and as such, this failure is fatal to his *prima facie* case of race discrimination.  Because Douglas cannot show he was treated differently than other non-protected employees, he cannot establish a *prima facie* case of race discrimination. Consequently, there is no genuine dispute of any material fact, and it is therefore recommended that Esper's motion for summary judgment be granted regarding Douglas's claim for race discrimination.

D.   Douglas's Age Discrimination Claim

Esper argues that Douglas fails to establish a *prima facie* case under the ADEA because Douglas has not presented sufficient evidence to establish that his age was the but-for cause of any adverse employment action.  The ADEA prohibits an employer from discriminating "against any individual with respect to his terms of compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  In ADEA claims, the plaintiff bears the burden of persuasion to show that "age was the 'but-for' cause of the employer's adverse

action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009); *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 283 (6th Cir. 2012).

To establish a *prima facie* case of age discrimination under the ADEA absent direct evidence of discrimination, the plaintiff must establish: (1) he was a member of the protected class, meaning he was at least forty years old; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by a substantially younger individual. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521 (6th Cir. 2008)(citing *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007). If the plaintiff establishes a *prima facie* case, then the defendant must "articulate some legitimate, nondiscriminatory reason" for the termination. *McDonnell Douglas*, 411 U.S. at 802. "If the defendant meets this burden, then the burden of protection shifts back to the plaintiff to demonstrate that the proffered reason is a pretext." *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003).

The only indication that age was a factor in any employment decision is Douglas's bare assertion that the Agency was hiring individuals who were younger than him. (Def.'s Ex. 1, ECF No. 30-3.) Douglas has failed to provide any evidence whatsoever that his age was the determining factor in any of the employment decisions he complains of. Consequently, Douglas cannot establish

a *prima facie* case and there is no genuine dispute of material fact as to whether or not age was the but-for cause of any of the Agency's actions. Therefore, it is recommended that Esper's motion for summary judgement as to Douglas's claim of age discrimination pursuant to the ADEA be granted.

E.   Douglas's Retaliation Claim

Esper contends that he is entitled to summary judgment because Douglas cannot establish a *prima facie* case of retaliation. Douglas primarily argues that he is being retaliated against for his prior activity in the 1997 settlement and for being a union representative in EEO complaints. (Def.'s Exs. 1, 32, ECF Nos. 30-3, 30-32.) Title VII contains an anti-retaliation provision, which provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). A retaliation claim can be established through either direct evidence or circumstantial evidence. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010). Direct evidence "requires the conclusion that unlawful retaliation was a motivating factor in the employer's action." *Id.* When the plaintiff offers no direct evidence, but instead offers circumstantial evidence, the retaliation claim is governed by the burden shifting framework set forth in *McDonnell Douglas*.

23

To establish a *prima facie* case of retaliation under Title VII, the plaintiff must demonstrate that: (1) he acted in a manner protected; (2) the defendant knew of this protected activity; (3) the defendant subsequently took a materially adverse action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse action. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Douglas can establish the first, second, and third prongs of a *prima facie* case of Title VII retaliation. The record establishes, and Esper acknowledges, that Douglas engaged in protected activity when he participated in the 1997 settlement and when he was a union representative in EEO claims. (Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 30-1.) It is also clear from the record, and Esper admits, that management knew of Douglas's protected activity. (*Id.*) While the other actions were not likely adverse employment actions, *see supra* Part II.C.2., Douglas's termination was an adverse action.

Douglas cannot, however, establish the fourth prong – a nexus between the protected conduct and the adverse action. "In order to establish a causal connection between the protected conduct and the adverse action, [the] plaintiff must produce enough evidence of a retaliatory motive such that a reasonable juror would conclude that the [adverse action] would not have occurred but for his engagement in protected activity." *Eckerman v. Tenn. Dep't of*

24

*Safety*, 636 F.3d 202, 209 (6th Cir. 2010); *see also Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 769 (6th Cir. 2008)(holding that the plaintiff must offer sufficient evidence raising the inference that the protected activity was the reason for the adverse employment action in order to establish a causal connection). Evidence that the adverse action was taken shortly after the plaintiff's exercise of protected rights is one way to establish a causal connection. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

In *Mickey v. Zeidler Tool & Tie Co.*, 516 F.3d 516 (6th Cir. 2008), the Sixth Circuit explained:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Id.* at 525.

Douglas cannot rely solely on temporal proximity to establish his retaliation claim. The EEO settlement occurred roughly fifteen years before his termination and Douglas ceased to be the union president in July 2011 – over a year before his termination. Because of the length of time that has elapsed between the protected activity and the alleged adverse employment actions,

Douglas must "couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey*, 516 F.3d at 525.

The only other evidence of retaliatory conduct provided by Douglas are his conclusory statements in his deposition and the affidavits of Jerry L. Britton ("Britton") and Richard Qualls ("Qualls"). In his deposition, Douglas indicated that "most of the retaliation [is] from being a union man and also the EEO complaint." (Def.'s Ex. 1, ECF No. 30-3.) Essentially, Douglas states that he was refused promotions and other positions as retaliation for his protected activity, but does not point to any particular, discrete act by the Agency. (*Id.*) In his words, Douglas was retaliated against because no supervisor wanted to work with him – he was essentially "blackballed." (*Id.*) Douglas stated that this was a result of him being outspoken and the discrimination being exposed, presumably in relation to the 1997 settlement. (*Id.*)

Douglas's allegations are somewhat substantiated by Britton and Qualls's affidavits. Britton indicated that Douglas is reprised against and that management did not like him. (Pl.'s Ex. 5, ECF No. 36-5.) Qualls stated that he was led to believe that management within the Agency had prejudiced themselves against Douglas because of his union activity. (*Id.*) However, "[s]ubjective beliefs, without affirmative evidence, are

26

insufficient to establish a claim of retaliation." *Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 491 (6th Cir. 2006); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-85 (6th Cir. 1992)("Even if the Court were to consider the Affidavit, the statements contained therein are nothing more than rumors, conclusory allegations and subjective beliefs which are wholly insufficient evidence to establish a claim. . . .")

The most specific instance of alleged retaliation that either Britton or Qualls provide is that the Agency did not select Douglas to be in the upper mobility program because "management did not like him because of the [settlement in 1997] and [because Douglas was a union] president." (Pl.'s Ex. C, ECF No. 36-5.) Douglas, however, does not list this as a particular adverse action, and to the extent this conduct is in essence a failure to promote, this court has already recommended summary judgment be granted as to that claim, *see supra* Part II.B. Considering the length of time and the absence of specific evidence of retaliatory motive, Douglas cannot establish a *prima facie* case of retaliation. It is therefore recommended that Esper's motion for summary judgment be granted in regard to Douglas's retaliation claim.

F.  Douglas's Disability Discrimination and Failure to Accommodate Claims Based on PTSD

Douglas alleges both that he was discriminated against on the basis of his disability and the Agency failed to accommodate him.

(Compl., ECF No. 1.) Esper disputes both claims in his motion for summary judgment. (Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 30-1.) Esper first argues that all Douglas's disability-based claims should be dismissed because Douglas checked the ADA on his court-supplied form, rather than listing the Rehabilitation Act because the Rehabilitation Act is the exclusive remedy for federal employees. (*Id.*) Esper is correct in that the Rehabilitation Act is the exclusive remedy for disability discrimination for federal employees. *Plautz v. Potter*, 156 F. App'x 812, 816 (6th Cir. 2005). The Sixth Circuit, however, has approved of construing a plaintiff's "ADA" claim as a Rehabilitation Act claim because "there is no significant difference between the substantive standards of the ADA and the Rehabilitation Act." *Id.* Accordingly, this court will construe Douglas's complaint as a complaint for disability discrimination and failure to accommodate under the Rehabilitation Act.

1.  *Douglas's Disability Discrimination Claim*

Esper argues that Douglas cannot establish his *prima facie* case of disability discrimination. (Def.'s Mem. in Support of Mot. for Summary Judgment.) To establish a *prima facie* case of disability discrimination, Douglas must show that: (1) he is disabled, (2) he is otherwise qualified for the job, with or without reasonable accommodation, and (3) he was discriminated against solely because of his disability – which may generally be

28

shown by demonstrating that the plaintiff suffered an adverse employment action. *Plautz*, 156 F. App'x at 816 (interpreting an ADA claim as a Rehabilitation Act claim and listing the elements of a *prima facie* case for disability discrimination); *see also Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002)(listing the same three elements).

As to the first element of a *prima facie* case, Esper does not dispute that as of March 5, 2012, Douglas was disabled. (*Id.*) Esper argues, however, that prior to March 5, the Agency had no other "reasonable notice" of Douglas's "alleged disability" other than Douglas's "subjective complaints of fear" and therefore none of the Agency's actions prior to March 5, 2012 can be considered as discriminatory – including Douglas's allegation that he was forced to return to the Dredge Hurley between February and March 2012.

An agency is deemed to have knowledge that an employee has a disability when the employee tells the agency about a condition, or when the agency otherwise becomes aware, such as by observation. *See Karlik v. Colvin*, 15 F. Supp. 3d 700, 708 (E.D. Mich. 2014.) The record supports that the Agency had sufficient knowledge that Douglas was disabled at least by February 28, 2012, if not earlier. On February 28, 2012, Douglas sent the Agency a letter from Milam dated December 11, 2011 which expressly described Douglas's symptoms and stated that Douglas suffered from PTSD. (Def.'s Ex.

13, ECF No. 30-14.)  Accordingly, Douglas can show that he was disabled at least by February 23, 2012, establishing the first prong of his *prima facie* case for each of the alleged discriminatory actions of the Agency.

As to the second prong of Douglas's *prima facie* case, Esper argues that Douglas was not otherwise qualified for his position, nor any other available position within the Agency.  (Def.'s Mem. in Support of Mot. for Summary Judgment, ECF No. 30-1.)  Under the Rehabilitation Act, the plaintiff must establish that he or she is "otherwise qualified" for the position in question with or without a reasonable accommodation.  29 C.F.R. § 1630.2(n)(1).  In the portion of Esper's motion addressing Douglas's disability discrimination claim, Esper fails to make any argument as to why Douglas is not otherwise qualified.[5]  Esper simply states that "[Douglas] still cannot meet prongs two and three in that he is not a qualified individual. . . ."  (Def.'s Mem. in Support of Mot. for Summary Judgment, ECF No. 30-1.)  The remaining portion of Esper's argument regarding Douglas's claim for disability discrimination focuses on prong three of his *prima facie* case and not on prong two.  The moving party has the burden of showing that there are no genuine issues of material fact at issue in the case.

---

[5] Esper later argues that Douglas is not otherwise qualified for purposes of his failure to accommodate claim.  The issue of whether Douglas is qualified is therefore addressed in Part II.F.2 of this Report and Recommendation.

*LaPointe*, 8 F.3d at 378.  Here, Esper did not establish that there
is no genuine dispute of material fact as to Douglas's
qualification.  Rather, Esper made a blanket statement without
pointing to any facts in the record or case law to support this
conclusion.

To satisfy the third prong of a *prima facie* case for
disability discrimination, Douglas must show that he suffered
adverse employment action.  Esper argues that Douglas was not
subject to any adverse employment action because: (1) the Agency
"went above and beyond" to provide Douglas opportunities to file
for OWCP; (2) the Agency provided Douglas time to provide medical
documentation; (3) the Agency provided Douglas with time and
resources to work on his resumé for another position; and (4) the
Agency reviewed Douglas's qualifications on multiple occasions in
an attempt to find him a vacant position.  (Def.'s Mem. in Supp.
of Mot. for Summ. J., ECF No. 30-1.)

Like Title VII cases, "adverse employment action" under the
Rehabilitation Act – or the ADA – typically include those actions
which amount to a "'materially adverse change in the terms of
conditions of . . . employment because of [the] employer's
conduct.'"  *Plautz*, 156 F. App'x at 817 (citation omitted).  For
example, adverse employment actions include "tangible employment
action[s] . . . such as hiring, firing, failing to promote,
reassignment with significantly different responsibilities, or a

31

decision causing a significant change in benefit." *Id.* (citing to *Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). While the other actions Douglas complains of do not amount to a materially adverse change in his employment, his termination does.[6] Accordingly, Douglas can establish the third prong of his disability discrimination based on his termination.   Thus, there remains a genuine dispute of material fact as to Douglas's *prima facie* case for discrimination because of his disability.   As such, summary judgment is not appropriate on this basis.[7]

2.   *Douglas's Failure to Accommodate Claim*

Esper also argues that Douglas cannot establish a *prima facie* case of disability discrimination for failure to accommodate. (Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 30-1.)   To establish a *prima facie* case of failure to accommodate, the plaintiff must show that:   (1) he is disabled, (2) he is otherwise qualified for the position such that he can perform the essential

---

[6] *See supra* Part II.C.2.

[7] Esper also cites to a portion of Douglas's deposition in which Douglas admits that the Agency has accommodated other employees, listing Rick Nowadays as an example.   Apparently, Esper cites to this to demonstrate that the Agency could not have discriminated against Douglas because this example is proof that the Agency does not have any animus against individuals with disabilities.   It is unclear, however, how this inference is made and Esper cites to no case law to support the proposition that because an Agency accommodated one individual, it is free from discriminatory motive in regard to another.   Simply because the Agency accommodated one individual does not necessarily mean that the Agency did not discriminate against *Douglas* on the basis of *his* disability.

functions of the job with or without a reasonable accommodation,
(3) the agency knew of or had reason to know of the plaintiff's
disability, (4) an accommodation was needed, and (5) the agency
did not provide the necessary accommodation. *See Gaines v. Runyon*,
107 F.3d 1171, 1175 (6th Cir. 1997). Esper contends that Douglas
cannot establish the second and forth prong of his *prima facie*
case.

As discussed above, the record establishes that Douglas does
suffer from PTSD and is disabled. Furthermore, the Agency knew at
least by February 23, 2012 Douglas was likely suffering from PTSD
and may need an accommodation, *see supra* Part II.F.1.
Additionally, it is not disputed that Douglas needed an
accommodation. Accordingly, Douglas can establish the first,
third, and fourth prongs of his *prima facie* case.

As to the second prong, there is a genuine dispute of material
fact as to what Douglas's exact position was and whether Douglas
was qualified for it. Esper argues that Douglas was not qualified,
with or without an accommodation for his position. (Def.'s Mem.
in Supp. of Mot. for Summ. J., ECF No. 30-1.) The term qualified
means "that the individual satisfies the requisite skill,
experience, education and other job-related requirements of the
employment position such individual holds or desires and, with or
without reasonable accommodation, can perform the essential
functions of such position." 29 C.F.R. § 1630.2(n)(1). Within

33

the Sixth Circuit, courts have examined the question of whether an
individual's original position controls this determination or
whether the individual's rehabilitation/accommodation position
controls.  The Sixth Circuit has answered affirmatively to both,
depending on the situation at hand.  *Compare Lai Ming Chui v.
Donahoe*, 580 F. App'x 430 (6th Cir. 2014) *with Jones v. Potter*,
488 F.3d 397 (6th Cir. 2007).  In *Lai Ming Chui v. Donahoe*, the
court found that the position in question was the original position
of mail processing clerk.  *Lai Ming Chui*, 580 F. App'x at 436.  In
that case, the plaintiff was originally assigned the position of
mail processing clerk, but when she became disabled, she was placed
in a rehabilitation assignment.  *Id.* at 432.  While in that
assignment, the plaintiff performed clerical work and spent her
day as a "helper" to supervisors and managers.  *Id.*  During this
time, however, the plaintiff received the same salary and benefits
as her original position, and she retained the title of mail
processing clerk.  *Id.* at 435.  In addition, there was no evidence
on record that this "helper" position was a position within the
agency.  *Id.*

In *Jones v. Potter*, however, the court found that there was
a genuine issue of material fact regarding what the plaintiff's
position was and whether he was qualified at the time he was
terminated in violation of the Rehabilitation Act.  *Jones*, 488
F.3d at 405.  There, the plaintiff's original position was mail-

34

handler.  *Id.* at 400.  After several injuries, the agency assigned
him to a limited-duty position of torn-mail handler.  *Id.*  The
court found that because he had spent a majority of his time as a
torn-mail handler, at the very least, a jury could reasonably
conclude that the plaintiff's job was the torn-mail handler
position rather than his original position of mail handler.  *Id.*
at 405.

The instant case is unique.  Douglas's original position was
a seasonal pipelineman and his position of record was pipelineman,
but, as a result of the EEO settlement in 1997, Douglas was made
a permanent employee of the Agency and spent the majority of his
time in the EEY electrical shop.  (Pl.'s Ex. A, ECF No. 36-1;
Def.'s Ex. 1, ECF No. 30-3.)  From the record, it appears that
prior to the EEO settlement those in the pipelineman position
worked seasonally for roughly four months of the year, depending
on the dredging season, and then were temporarily laid off.  (Def's
Ex. 1, ECF No. 30-3; Pl.'s Ex. C, ECF No. 36-5.)  Thus, by very
definition, the pipelineman position was not a full-time permanent
position; however, after the 1997 EEO settlement, Douglas was
converted to a full-time, permanent employee.  (Def.'s Ex. 1, ECF
No. 30-3; Def.'s Ex. 27, ECF No. 30-28).  In order to accommodate
this switch from seasonal to full-time, the Agency placed Douglas
in the EEY electrical shop for roughly eight months of each year
for the twelve years preceding the October 2009 accident.  (Def.'s

Ex. 1, ECF No. 30-3; Pl.'s Ex. C, ECF No. 36-5.)  Furthermore,
both after the accident and after receiving the letter from Dr.
Crenshaw, the Agency allowed Douglas to continue working in the
EEY electrical shop like he had been doing since 1997. (Def.'s
Ex. 30, ECF No. 30-31.)

Esper argues that Douglas's assignment in the EEY electrical
shop was merely a temporary position and that Douglas's position
remained pipelineman. (Def.'s Mem. in Supp. of Mot. for Summ. J.,
ECF NO. 30-1.)  The record establishes, however, that as part of
his full-time employment with the Agency, Douglas worked in the
EEY electric shop and did so the majority of his time both before
and after the accident in October 2009.  If Douglas's position is
strictly construed as pipelineman, then he was not qualified for
the position because he could not be on or near the water and thus
could not perform the essential functions of his job. If Douglas's
position were actually the EEY electric shop position – the one he
had been performing for twelve years prior to the accident eight
months out of each year and for the majority of time after he was
disabled – then nothing indicates that he was not qualified for
that position.  Accordingly, construing the evidence in the light
most favorable to the non-moving party, there is a genuine dispute
of material fact as to what exactly Douglas's position was and
whether he was qualified, with or without an accommodation.

The fifth prong Douglas must establish for a *prima facie* case is that the Agency failed to accommodate him.  Esper argues that the Agency attempted to accommodate Douglas, but that it could not do so without undue hardship.  (Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 30-1.)  Esper argues that because the Agency asked Douglas to complete a resumé to help determine alternate positions, the Agency engaged in the interactive process with good faith.  (*Id.*)  Esper further states that there were no vacant positions that Douglas was qualified for, or if he was, it would violate his medical restrictions.  (*Id.*)  Accordingly, Esper argues that the Agency met its burden in attempting to accommodate Douglas.

An employee's burden of establishing a *prima facie* case under the Rehabilitation Act "is not onerous" and "requires less than a typical preponderance-of-the evidence showing."  *Jones*, 488 F.3d at 404.  The plaintiff must merely show the existence of a plausible accommodation.  *See Hale v. Johnson*, 245 F. Supp. 3d 979, 992 (E.D. Tenn. 2017).  It is the defendant's burden to establish that accommodating the plaintiff is an undue hardship.  *See Nighswander v. Henderson*, 172 F. Supp. 2d 951, 964 (N.D. Ohio 2001)(determining that the defendant presented no evidence showing that accommodating the plaintiff's disability by allowing her to remain in her modified position was an undue hardship for the defendant).  An employer does not need to create a new position

37

for the purposes of providing an accommodation, *Conklin v. City of Englewood*, No. 95-3786, 1996 WL 560370, at *2 (6th Cir. Oct. 1, 1996).

In his response to Esper's motion for summary judgment, Douglas attached affidavits signed by Britton and Qualls submitted before the EEOC Office of Federal Operations in 2013. (Pl.'s Ex. C, ECF No. 36-5.) In his sworn affidavit, Britton explained that he witnessed Douglas's duties when he was in the EEY electric shop. (*Id.*) According to Britton, Douglas primarily performed duties in the electric shop, rather than as pipelineman. (*Id.*) In response to the specific question of whether he knew of any jobs that Douglas would have qualified for that he was not allowed to pursue since March 2012, Britton responded yes. (*Id.*) Specifically, Britton indicated that there was hired labor in the revetment section and work in the EEY. (*Id.*) Britton also noted that he believed Douglas could have continued his work with Qualls in the electric shop as he had been doing since 1997 as an electrician helper. (*Id.*) In addition, Britton identified another position within the Agency that would have been landside and would not have been near the water while completing duties, which Britton knew Douglas was qualified to perform because Douglas had performed similar duties on a job in Missouri in 2011 under Britton's supervision. (*Id.*)

In his affidavit, Qualls explained that he had worked with Douglas since 1997 when he was assigned to the EEY during the non-dredging season for approximately eight to nine months out of each year. (*Id.*) Qualls further explained that the duties assigned to Douglas while in the electric shop were assigned to him in response to the 1997 settlement, which required him to work full-time. (*Id.*) Qualls indicated that Douglas has been fairly successful in completing those duties assigned. (*Id.*)

Esper merely asserts that Britton and Qualls were not the decisionmakers. (Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 30-1.) Regardless of whether they were decisionmakers, Douglas has demonstrated that there was potentially an accommodation which existed in the form of other work or work in the electric shop. Thus, Douglas has raised a genuine dispute of material fact as to whether there was a reasonable accommodation which the Agency failed to provide to him.

3.   *The Agency's Legitimate Non-Discriminatory Reasons*

Under the *McDonnell Douglas* burden shifting analysis, if the plaintiff establishes a *prima facie* case, then the defendant must articulate a legitimate, non-discriminatory reason. *Jones*, 488 F.3d at 403-04 (applying the *McDonnell Douglas* burden shifting to claims under the Rehabilitation Act). In order to shift the burden back to the plaintiff, the defendant only needs to produce enough evidence to allow a trier of fact to rationally find that the

agency's actions were not based on unlawful discrimination. *See Burdine*, 450 U.S. at 255-56. The defendant must, however, demonstrate the legitimate non-discriminatory reason with sufficient clarity so as to enable the plaintiff to have fair opportunity to demonstrate pretext. *Id.* at 256.

Esper argues that the Agency had legitimate, non-discriminatory reasons for its conduct. First, Esper argues that the Agency had a legitimate need for Douglas to return to work in his position as pipelineman in February and March 2012. (Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 30-1). Second, Esper argues that the Agency had to remove Douglas because his restrictions prevented him from boarding the Dredge Hurley, even when it was dry docked. (*Id.*) Specifically, Esper argues that any type of restructuring of the pipelineman position would not be an effective accommodation for Douglas and because there was no anticipated date of when Douglas's PTSD would improve, the only option was to move him to a vacant position. (*Id.*) According to the Agency, there were none. (*Id.*) Esper also alleges that Douglas could not work anywhere in the EEY – presumably including the electric shop he had been working in since 1997 – because Douglas could potentially see the Mississippi River as the EEY sits on the bank. (*Id.*) Lastly, Esper argues that Douglas showed unwillingness to consider any other position outside of Memphis. (*Id.*)

For purposes of analysis, the court will assume that Esper has sufficiently articulated legitimate, non-discriminatory reasons. Under the *McDonnell Douglas* burden shifting analysis, the burden shifts back to Douglas to establish pretext once Esper has articulated a legitimate, non-discriminatory reason. *Jones*, 488 F.3d at 403-04.

### 4. *Pretext*

To withstand the defendant's motion for summary judgment, the plaintiff must "produce sufficient evidence from which a jury could reasonably reject [the defendant's] explanation and infer that the defendant[] intentionally discriminated against him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). The remaining question is whether the reason given is "simply a pretext designed to mask discrimination." *Jones*, 488 F.3d at 406 (citing *Burdine*, 450 U.S. at 253). The plaintiff can establish pretext by: (1) showing that the reason has no basis in fact; (2) the reason did not actually motivate the employer's action; or (3) by showing that the reason was insufficient to motivate the action. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008)(citations omitted). The plaintiff does not need to prove that the proffered reasons are in fact pretextual, but rather, "must prove only enough to create a genuine issue as to whether the rationale is pretextual." *Mitchell v. U.S. Postal Serv.*, 738 F. App'x 838, 847 (6th Cir. 2018)(citations omitted).

41

There is evidence in the record which establishes a genuine dispute of material fact as to whether any of the reasons given by Esper are pretextual.  Esper maintains that the Agency ordered Douglas to return to work on the Dredge Hurley in late February because the Agency had a legitimate need for Douglas to return to work and Douglas had not provided sufficient documentation that he was disabled prior to March 5.  As discussed above, however, an agency is considered aware of a plaintiff's disability when they have knowledge of or have reason to know that the plaintiff is disabled. *Karlik*, 15 F. Supp. 3d at 708.  Milam expressly stated in her letter which the Agency received on February 28, 2012, that Douglas suffered from PTSD.  This letter was sufficient to trigger the Agency's knowledge that Douglas may have a disability and to engage in the interactive process. *See Bridgewater v. Mich. Gaming Control Bd.*, 282 F. Supp. 3d 985, 997 (E.D. Mich. 2017)(explaining that the employer's duty to engage in the interactive process is triggered after either the employee proposes a reasonable accommodation or demonstrates the need for one).  A reasonable trier of fact could conclude that Esper's claim of insufficient documentation of Douglas's disability was not the true reason for the Agency's decision to disregard the earlier evidence and request Douglas to return to the Dredge Hurley.

In addition, the reason given by Esper as to why the Agency removed Douglas was because his restrictions prevented him from

boarding the Dredge Hurley and thus, Douglas could not perform his duties and the Agency could neither restructure the program nor know when Douglas's disability would improve. (Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 30-1.) Esper also rationalized Douglas's termination because there was no vacant position for which he could be accommodated. (*Id.*) As discussed in more detail above, Douglas responded to this contention by attaching affidavits of two other employees of the Agency who explained that there were open positions that Douglas would have been qualified for. (Pl.'s Ex. C, ECF No. 36-5.) In addition, Qualls, who had worked in the electrical shop with Douglas since 1997, explained that he knew that Douglas had been diagnosed with PTSD as a result of the October 2009 accident and he had not been given consideration by management. (*Id.*)

Direct evidence of discrimination is not required for a plaintiff to defeat a summary judgment motion and the summary judgment standard specifically requires that the court draw all inferences in the nonmoving party's favor, so long as it is not unreasonable or impermissible. *Jones*, 488 F.3d at 407. While these affidavits do not necessarily demonstrate direct evidence of discrimination, the inference is that there were in fact other available positions in the Agency and that rather than place Douglas there or allow him to continue the work he had been completing since 1997, the Agency terminated him because of his

disability.   Accordingly, this evidence suffices to establish a genuine dispute of material fact as to whether there truly were no other available positions, or whether this reason was pretext for discrimination.

Finally, Esper argues that because the EEY sits on the bank of the Mississippi River, Douglas also could not continue working in the electric shop which is in the EEY. (Def.'s Mem. in Supp of Mot. for Summ. J., ECF No. 30-1.)  However, Dr. Ballentine and Milam expressed to the Agency that working in the electrical shop in the EEY did not trigger Douglas's symptoms. (Def.'s Ex. 20, ECF No. 30-20; Def.'s Ex. 15, ECF No. 30-17.)  Accordingly, a reasonable trier of fact could find that this reason was not the true reason for the Agency's action.

As such, there is a genuine dispute of material fact as to whether the reasons proffered by Esper are in fact legitimate and non-discriminatory, or rather pretext for discrimination based on Douglas's disability.  Accordingly, because there are genuine disputes of material fact as to Douglas's *prima facie* cases and as to whether the reasons given by Esper are pretextual, it is recommended that Esper's summary judgment motion be denied regarding Douglas's claims under the Rehabilitation Act.

## II.   CONCLUSION

For the foregoing reasons, this court recommends that Esper's summary judgment motion be granted as to Douglas's claims for

failure to promote, disability discrimination on the basis of his hearing-related disability, race discrimination, color discrimination, age discrimination, and retaliation. This court further recommends that Esper's summary judgment motion be denied as to Douglas's claims for disability discrimination and failure to accommodate based on his PTSD.

Respectfully submitted this 6th day of November, 2019.


s/ Diane K. Vescovo_____
DIANE K. VESCOVO
Chief United States Magistrate Judge


NOTICE

Within fourteen (14) days after being served with a copy of this report and recommended disposition, a party may serve and file written objections to the proposed findings and recommendations. A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Failure to file objections within fourteen (14) days may constitute a waiver of objections, exceptions, and further appeal.